SCOTT and another, Plaintiffs in error, vs. THE STATE, Defendant in error.

*April 10—May 11, 1926.*

*Criminal law: Circumstantial evidence: Sufficiency to sustain conviction: Unlawful hunting of deer.*

1. Where evidence which is wholly circumstantial is relied on to convict, all the essential facts from which it is necessary to infer the direct fact must be proved beyond a reasonable doubt.  p. 243.
2. To sustain a conviction, evidence which is wholly circumstantial must not only be consistent with defendant's guilt but inconsistent with any other rational conclusion or reasonable hypothesis, and such as to leave no reasonable doubt of guilt. p. 243.
3. Circumstantial evidence in this case is examined and *held* to be insufficient to sustain a conviction that the defendants were unlawfullly hunting deer during the closed season and in the nighttime with an artificial light.  p. 244.

ERROR to review a judgment of the circuit court for Oneida county: A. H. REID, Circuit Judge.   *Reversed.*

Plaintiffs in error were convicted in the municipal court of Oneida county of unlawfully hunting deer during the closed season and in the nighttime with an artificial light. Upon appeal to the circuit court a jury was waived and the case was tried upon the record of the municipal court.   The defendants were found guilty, fined, and their rifle, battery, and spot light were confiscated and ordered sold.   The evi-

dence tending to show guilt was substantially as follows: Weaver, a conservation officer, testified:

"On July 24th I was near Willow Lake and saw the defendants there. About 1 o'clock at night we heard some shooting and we got up and walked down the road until we could see a light coming around the shore of the lake. We watched for a while and saw it coming down to Wilson's and we went down to the bridge and Mr. Fosnot and I held a pole across the road and stopped them. I asked them what they were doing there. *Mr. Scott* was driving the car and *Mr. Johnson* sat beside him in a Ford car. At the time I heard the shots on the lake, I was not close enough to see the lake. *Q.* Could you see the defendants on the lake? *A.* We could not tell who they were. When the boat landed, we saw a boat land, and saw him start the car and the lights flashed on the lake. It was so far we could not tell the people. We saw a bright light and in a short while the car started. I could not say it was these two defendants that got out of the boat and got into the car. I did not see any flashes of the gun. After the shots were heard and the boat was seen coming towards the shore, we went down to the road or public highway and watched at the bridge quite a while and the defendants came along in a Ford coupé. A pole, held on the ends by Mr. Fosnot and me, was stretched across the road about two feet and a half from the ground, and the only command given the defendants to stop was with a flash light. It was necessary to use the light in stopping their car and they stopped their car. I went out to the car and saw a gun and light and wanted to know where the deer was and they said they did not get it. I said, Did you use the battery to run those lights with, and he said No and then I had them get out of the car. I think they opened the door and I looked in and saw the gun, it was a rifle, with the spot light of the car. The gun was not loaded and I took the rifle, spot light, and battery. *Q.* Can you tell the court that you are sure these are the two defendants that were hunting with the light? *A.* I did not see them on the lake. *Q.* Did they admit they had been hunting on the lake? *A.* They said they used the battery in the back end of the car. Mr. Bosworth came up and says to *Mr. Scott,* 'You are pretty poor shots if you

did not get a deer in three shots,' and he says, 'I sometimes miss them.' This meeting occurred about 2 o'clock in the morning of the 24th. We were in Oneida county and the shooting was first heard at about 1 o'clock in the morning of the 24th. We were at the time three quarters of a mile north of Willow Lake in bed in a building and woke when the first shot was fired which came from the southwest. *Q.* What were they, rifle shots or gun shots? *A.* I would say they were rifle shots. They were not fired rapidly, but about one minute apart. After I got up, I dressed and went outside and down to the road. The building where I was in bed was in sight of the lake and there was a window 'partly' near the lake, but I could not see the light at all from the building. I walked down to the lake and got on a high point, possibly about eighty rods at the most from the boat, and watched the light, but did not hear any more shots. *Q.* Did you stop on this point as long as the boat was on the lake? *A.* We walked down to the road and prepared to intercept the car when it started back. We went down to the bridge. *Q.* How far? *A.* Three quarters of a mile. It was about half an hour from the time we were on the point until the car was seen. We did not go back to look again and could not tell how many men got out of the boat or whether the defendants were in the boat. All I could see was the light. The car was at Wilson's at the time the boat was on the lake. We were forty or fifty rods from the car at the time I heard the car start and saw the lights. I did not know who these two men were when they got in the car at Wilson's or whether the gun and the light which we took were in the car at the time at Wilson's. They may have been so far as I know. The light which was seized is useful for other purposes than shining deer, but it is not the type of light used for automobiles. The light itself is a portion of the light which is customarily used for automobile purposes. The battery which we seized is one commonly used for automobile purposes. It is a service battery— regular automobile battery. We were about forty or fifty rods from the lake when we intercepted defendants in their car. Wilson's is right on the outlet and I did not know the car was there at the time and did not learn it until it first started up. They did not get out of the car at once when we

stopped them.   Mr. Fosnot spoke first, but I do not know what he said.   I did not know who was in the car when we stopped it and do not know who was in the boat except from inference.   I and Mr. Fosnot talked with *Mr. Scott,* but I do not remember what he said.   *Mr. Scott* said he did not get the deer.   *Q.* Did he use those words?   *A.* He said he did not get the deer.   When they talked again I said, You did not get him? and he said No, I did not get him, and then I told him to get out.   They did not protest about getting out and I found horse hair on one man but no deer hair nor fish scales on either man, but I found water.   I would not want to say there was no water.   *Q.* You never suspected that any one had been fishing?   *A.* No, sir.   I do not claim to know that the shots came from the occupants in this boat.   My only judgment on that point is that I heard three shots and believe they came from the lake.   *Q.* What else did *Mr. Scott* say?   *A.* He did not say much of anything to us.   In fact that was about all that was said.   Mr. Bosworth came up and said, 'You are a pretty poor shot if you could not get him in three shots,' and he said, 'Well, I miss them once in a while.' "

Mr Fosnot testified as follows:

"I was with Mr. Weaver the morning that the car owned by *Mr. Scott* was searched near Willow Lake.   I heard the testimony of Mr. Weaver.   I was in the building.   The building was owned by Joe Rose, or Ross, who is running a resort on Long Lake.   I got right up after Mr. Weaver, but did not hear any of the three shots.   I was with Mr. Weaver when he went out and saw the party and we had a birch pole across the road, used flash lights to stop them. I cannot testify that it was the defendants on the lake or that it was the defendants who fired the shots.   *Q.* Did you know whether or not the gun was used in hunting deer? *A.* It had been fired.   It was dirty.   I did not have any conversation with *Scott* or *Johnson* when the car stopped. *Q.* Did you or either of them have any conversation? *A.* Yes, sir; I said, What is the matter?   Couldn't you hit them after shooting three times? and he said, 'I miss them once in a while.'   *Q.* Was anything else said by *Scott* or *Johnson* at that time?   *A.* No, except that Mr. Weaver told

them to go to Minocqua.  No admission that they had fired the shots was made.  It was a strong light and the reflection could be seen in the sky.  It was a very bright light and the only light on the lake."

It is stipulated that if Mr. Bosworth was here he would testify substantially to the same statements made by Mr. Weaver and Mr. Fosnot as to what happened when Mr. Bosworth was present.  *Mr. Scott* testified as follows:

"It is true that Conservation Wardens Weaver and Fosnot and Bosworth stopped me and *Mr. Johnson* July 24th at Willow Lake.  At the time I had in my possession no firearms or a search light which are used for the purpose of shining deer.  I did not hunt deer on the 24th or 23d of July or any other day.  I and *Mr. Johnson* were in a boat on the lake fishing.  *Mr. Johnson* was with me in the same boat.  We caught some fish and went to Boyle's cottage and fried them and ate them.  *Q.* Is this the gun and light you had with you?  *A.* I did not have the gun, I had the light.  *Q.* This is the light?  *A.* Yes, sir.  I did not have a gun in the boat and did not fire any shots in the boat that night.  I was out on the lake about three hours.  I was there at 1 o'clock and some time between 1 and 2.  I know where Wilson's resort is.  We landed the boat at Wilson's resort.  *Q.* This battery that has been spoken of is the battery you used for the light?  *A.* Yes, sir.  *Q.* You say no shots were fired that night?  *A.* No, sir.  The only time this rifle was fired that night at all was at a target mark at our camp.  Our camp is two miles from Wilson's resort. The others at Boyle's resort who were fishing were Harvey Johnson, William Solomon, Einar Mantey, Joe Maki, and J. Kiepaneu.  They were not in the boat with me.  We had two boats.  We did not go to Wilson's Landing together. All landed at Wilson's Landing within ten or fifteen minutes apart.  *Q.* When did you fry the fish?  *A.* We fished on the lake and went over to Boyle's cottage, and four stayed there and *Johnson* and I came home.  I did not say to the conservation wardens, or any of them, when they stopped me that I had been hunting deer.  *Q.* Did you have any conversation with them?  *A.* I did; they asked me what I had, and I told them I did not have anything.  Mr.

Weaver said it is not your fault and I did not say anything
more. *Q.* Did Mr. Bosworth say you are not a very good
shot to shoot three times and miss them? *A.* I don't know.
I did not open the door of the car until they asked me to
come out. The windows were down. The door was on
the right-hand side. Both of us got out on the right-hand
side. I did not open the door when Mr. Weaver came up.
*Q.* And you say that you did not hunt deer on the lake that
night? *A.* No, sir. *Q.* Did you have the light working on
the lake that night? *A.* We used it to see, it was very
dark. We used it to land fish and see to bait the hook.
I could not see without the light."

To test the validity of their conviction they sued out a
writ of error.

For the plaintiffs in error the cause was submitted on the
briefs of *G. M. Sheldon* of Tomahawk, attorney, and *Philip
F. La Follette* and *Glenn D. Roberts,* both of Madison, of
counsel, and a separate brief by *G. M. Sheldon,* attorney,
and *La Follette & Rogers* of Madison, of counsel; and for
the defendant in error on that of the *Attorney General,
J. E. Messerschmidt,* assistant attorney general, and *John
W. Kelley,* district attorney of Oneida county.


VINJE, C. J. The evidence against the defendants was
wholly circumstantial, and where that is the case, in order
to sustain a conviction all the essential facts from which it
is necessary to infer the direct fact must be proved beyond
a reasonable doubt. And such circumstantial evidence must
not only be consistent with defendants' guilt but it must be
inconsistent with any other rational conclusion or reasonable
hypothesis, and such as to leave no reasonable doubt of their
guilt. Tested by this rule we think the evidence fails to
sustain the conviction. The circumstantial facts here estab-
lished were (1) hearing shots fired in the direction of the
lake; (2) seeing a light on the lake; (3) *Scott's* answer to
a statement that he did not get the deer, that he missed them

once in a while; and (4) their possession of a gun, battery, and spot light.

*Scott* denied that he or *Johnson* was hunting, denied that they fired a gun on the lake that night, denied that they had a gun in the boat. He admitted they had the light and battery in the boat to aid them in seeing to bait their hooks and land the fish, and said they had used the gun at their camp to shoot at a mark. It is shown that at least five other persons were out on the lake that night in boats. The officers could not say that the defendants were out on the lake; they could not definitely say that the shots were fired on the lake; they did not see defendants land; they could not tell what articles they took from the boat. Even if defendants' testimony be disbelieved, the inference of their guilt is not strong enough to rebut every other reasonable conclusion. No shots may have been fired on the lake; but if so, they may not have been fired by the defendants; or they may not have been fired at deer. These are all reasonable inferences that may be drawn from the State's evidence alone. *Scott's* alleged admission that he missed once in a while is too vague and indefinite upon which to base a conviction. Such a statement might be made on such an occasion by one entirely innocent of the offense charged. It might be naught but the jocular response to what might have been considered an impertinent question. *Scott* testifies that he has no recollection of making it.

Taken as a whole, the evidence fails to satisfy our minds of the guilt of the defendants to the degree that no other reasonable conclusion is possible, and that is the test in cases of circumstantial evidence. In reaching our conclusion we are not unmindful of the rule as to fanciful or skeptical doubts, neither are we to be understood as attempting to demonstrate that the defendants are innocent. We simply say that their conviction is not sustained by that quantum and certainty of proof that the law requires where the evidence is wholly circumstantial.

*By the Court.*—Judgment reversed, and cause remanded with directions to discharge the defendants and restore to them the articles seized or their value.